UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MONIQUE MARIE TURENNE,
      Petitioner,

vs.                          Case No.:  5:21cv171/MCR/ZCB

RICKY D. DIXON,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a state habeas corpus case under 28 U.S.C. § 2254.  Petitioner, Monique Marie Turenne, was convicted in 2005 for the second-degree murder of her husband.  Approximately sixteen years after her conviction, Petitioner filed the current § 2254 petition, a supplemental petition, and supporting documents.  (Docs. 1, 2, 3, 3-1).  Respondent has moved to dismiss, arguing the petition was filed beyond the one-year limitation period found in 28 U.S.C. § 2244(d)(1).  (Doc. 17).  Petitioner argues that her untimeliness should be excused because "new evidence" shows that she is actually innocent.  (Docs. 24, 24-1).  As explained below, the "new evidence" submitted by Petitioner fails to meet the high standard for the actual

1

innocence exception to § 2244(d)(1)'s one-year time bar.    Thus, Respondent's motion should be granted, and the petition dismissed as untimely.[1]

## I.    Background

David Turenne was a Major in the Canadian Air Force who was stationed at Tyndall Air Force Base in Panama City, Florida.    On February 9, 1996, Major Turenne was bludgeoned to death in his yard.    The police investigation led to murder charges against Petitioner and her paramour, Ralph Crompton.    Those charges were filed in the Circuit Court in and for Bay County, Florida.    (Doc. 20-1 at 34-35). Shortly after David's death, Petitioner returned to her home country of Canada. (Doc. 20-17 at 9-10).    After she was charged, Petitioner fought extradition from Canada to the United States.    While Petitioner was awaiting extradition, Crompton was convicted of first-degree murder.    (*Id*. at 9).    Petitioner was finally extradited, and a jury convicted her of second-degree murder on June 17, 2005.    (Doc. 1 at 1; Doc. 20-6 at 62).    She was sentenced to 260 months' imprisonment.    (Doc. 20-6 at 72).

---

[1] Petitioner has requested an evidentiary hearing, but she has not met her burden of showing that such a hearing is necessary.  *See* Rule 8(a), Rules Governing Section 2254 Cases; *see also Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (stating that "the burden is on the petitioner to establish the need for an evidentiary hearing") (cleaned up).

The Florida First District Court of Appeal affirmed her conviction without opinion. *Turenne v. State*, 953 So. 2d 523 (Fla. Dist. Ct. App. 2007). Her request for rehearing was denied. (Doc. 20-22 at 7). Petitioner then commenced state court post-conviction proceedings by filing a motion under Fla. R. Crim. P. 3.850 on April 9, 2008. (Doc. 21-7 at 99 through 21-9 at 99). The state trial court summarily denied many of Petitioner's claims, held an evidentiary hearing on others, and eventually denied them all. (Doc. 21-11 at 28; Doc. 21-13; Doc. 21-12 at 87-90). Petitioner appealed, the appellate court summarily affirmed, and the mandate issued on June 29, 2010. *Turenne v. State*, 37 So. 3d 855 (Fla. Dist. Ct. App. 2010); (Doc. 21-17 at 3).

Next, Petitioner filed a second Rule 3.850 motion on June 24, 2010, which was followed by an amended motion. (Doc. 22-1 at 13-40; Doc. 22-1 at 48-78). The state trial court denied the motion. (Doc. 22-2 at 13-16). Petitioner appealed, the appellate court summarily affirmed, and the mandate issued on August 19, 2011. *Turenne v. State*, 88 So. 3d 156 (Fla. Dist. Ct. App. 2011); (Doc. 22-5 at 3).

After that, Petitioner filed a motion for DNA testing in state trial court on July 22, 2011, which was followed by an amended motion. (Doc. 22-7 at 2-16; Doc. 22-7 at 38-58). The state trial court denied the motion. (Doc. 22-8 at 2-6). Petitioner appealed, the appellate court summarily affirmed, and the mandate issued on August

1, 2012. *Turenne v. State*, 92 So. 3d 827 (Fla. Dist. Ct. App. 2012); (Doc. 23-1 at 5).

As her final act in state court, Petitioner filed a third Rule 3.850 motion on February 28, 2013, alleging newly discovered evidence. (Doc. 23-2 at 16-26). The state trial court denied the motion. (Doc. 23-2 at 79-84). Petitioner appealed, the appellate court summarily affirmed, and the mandate issued on March 19, 2014. *Turenne v. State*, 134 So. 3d 457 (Fla. Dist. Ct. App. 2014) (Table); (Doc. 23-5 at 153).

After a nearly seven-year litigation hiatus, Petitioner filed the current petition for habeas corpus under 28 U.S.C. § 2254 on June 14, 2021. (Docs. 1, 2, 3). Respondent subsequently moved to dismiss as untimely. (Doc. 17). Petitioner has responded in opposition. (Doc. 24).

## II.    Discussion

### A.    Petitioner's § 2254 petition is untimely

Respondent argues that the § 2254 petition is untimely. (Doc. 17). Petitioner agrees but argues the untimeliness should be excused because "new evidence" shows that she is actually innocent. (Doc. 24 at 1). Before discussing whether the actual innocence exception applies, the Court will briefly explain why the petition is untimely.

A state prisoner has one year to file a habeas corpus petition under 28 U.S.C. § 2254.  As relevant here, the one-year clock runs from "(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1).  (*See* Doc. 17 at 5; Doc. 1 at 14-15; Doc. 24 at 1-6). The statute includes a tolling provision, which provides, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation . . . ." 28 U.S.C. § 2244(d)(2).

Petitioner's judgment became final when the ninety-day period to seek review in the United States Supreme Court expired.  That 90-day period was triggered on April 10, 2007—the date the Florida appellate court denied Petitioner's motion for rehearing.  (Doc. 20-22 at 7; Doc. 17 at 5).  Her conviction became final ninety days later, on July 9, 2007.  *See Morris v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1351, 1352-53 (11th Cir. 2021) (stating that petitioner's conviction became final ninety days after the state appellate court affirmed and denied motion for rehearing).  The federal limitation period commenced the next day, on July 10, 2007.  *See generally* Fed. R. Civ. P. 6(a)(1)(A) (stating that when calculating statutory time periods to "exclude the day of the event that triggers the period").

The federal limitation period ran for 274 days until Petitioner filed her first Rule 3.850 motion in state court on April 9, 2008. (Doc. 21-9 at 97).   That event stopped the clock, and it remained stopped until June 29, 2010, when the mandate issued on the denial of Petitioner's first Rule 3.850 motion.  (Doc. 21-17 at 3).  The clock restarted on June 30, 2010, and the one-year limitation period expired 91 days later (274 days + 91 days = 365 days) on September 28, 2010.[2]

Petitioner filed this § 2254 petition on June 14, 2021—nearly eleven years after the one-year limitation period expired.  (Doc. 1 at 15).  The petition, therefore, is untimely.  Because the petition is untimely and there is no equitable tolling argument, it is subject to dismissal unless Petitioner demonstrates that her petition should be heard under the actual innocence exception.

## B.    Petitioner has not shown that the actual innocence exception applies here

### 1.  The applicable legal standard

Petitioner asks the Court to excuse the untimely filing of her § 2254 petition because there is "new evidence" showing her actual innocence.   (Doc. 1 at 14; Doc.

---

[2] Petitioner's second Rule 3.850 motion did not toll the limitation period because it was untimely.  *See Pace v. DiGuglielmo*, 544 U.S. 408, 413-417 (2005) (explaining that an untimely state post-conviction petition is not properly filed within the meaning of § 2244(d)(2)).  And any motions Petitioner filed in state court after the limitation period expired did not toll it.  *Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir. 2000).

24 at 1-6). The Supreme Court has held that actual innocence serves as a gateway through which a petitioner may obtain review of an untimely habeas petition. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). In this context, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623-24 (1998). To pass through the actual innocence gateway, a petitioner must satisfy the standard articulated in *Schlup v. Delo*, 513 U.S. 298 (1995). *See McQuiggin*, 569 U.S. at 1928 (applying the *Schlup* standard to untimely § 2254 petitions). The *Schlup* standard requires a petitioner to show "that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable a doubt." *House v. Bell*, 547 U.S. 518, 536-37 (2006) (internal quotations omitted).

Under *Schlup*, a court is required to "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id*. at 538 (internal quotations omitted). The *Schlup* standard is a "demanding" one that is only met "in the extraordinary case." *Id*. at 536. Thus, it is "rare" for a petitioner to obtain review of an untimely habeas petition through the actual innocence gateway. *McQuiggin*, 569 U.S. at 386. This standard reflects the principle that "[h]aving been convicted by a jury . . ., [a habeas petitioner] no longer has the benefit of the presumption of innocence . . . . To the contrary, [the petitioner] comes before the habeas court with

7

a strong—and in the vast majority of the cases conclusive—presumption of guilt." *Schlup*, 513 U.S. at 326 n. 42.

A petitioner seeking to proceed through the actual innocence gateway must come forward "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup* 513 U.S. at 324. When considering an actual innocence claim, a court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted" at trial. *House*, 547 U.S. at 538 (cleaned up). An "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing" of actual innocence. *McQuiggin*, 569 U.S. at 399.

## 2. Petitioner has not met the applicable legal standard

Petitioner claims that she has "new evidence" that shows her actual innocence. That "new evidence" consists of statements made by individuals who claim to have seen David in a strip club, the Gold Nugget, on the night of his murder. (Doc. 24 at 2). Petitioner claims those statements show that David was living a double life that involved dealing drugs with shady people. And it was that double life that led to his murder. Additionally, Petitioner has submitted a two-sentence email that a toxicologist sent to her sister. (Doc. 3-1 at 65). According to Petitioner, the email

shows that David could possibly have been drinking on the night of his death—a fact that she says undercuts the prosecution's theory.

Because the *Schlup* standard requires the Court to consider this "new evidence" in the context of the whole trial record, the following is a summary of the evidence presented at Petitioner's trial. After summarizing the trial evidence, the Court will explain why the "new evidence" is insufficient to meet the demanding *Schlup* standard.

### a. David's body is found

At 5:44 a.m. on February 9, 1996, officers from the Panama City Police Department (PCPD) responded to Petitioner's house. (Doc. 20-9 at 107-11). The first officer on the scene found Petitioner outside kneeling next to her husband, David, who was face-down on the ground. (*Id.*) Although there was significant damage to David's head, Petitioner appeared calm and unemotional. Paramedics arrived and declared David dead. (*Id.*)

Investigators took various photographs of the scene. (Doc. 20-10 at 8-34). Those photographs showed David lying face down on a sidewalk that led to a backyard fence. (*Id.*). He was wearing a jacket, a white t-shirt, and jeans. (*Id.*). A blue canvas size 8 deck shoe was on David's right foot. (Doc. 20-11 at 75). His left foot was bare. David's blood-stained hands were at the top of his head. Underneath

his chest and midsection, there were the following items: a navy blue knit stocking cap, a white right-foot size 9D Nike tennis shoe, a brown left-handed work glove, a pair of women's white size 6 Coaster tennis shoes, and 98 cents in change. (Doc. 20-11 at 67-68, 72-74). In his pockets were an ATM card, a small amount of cash, and a receipt from Food World. (*Id*. at 81). The receipt was for a $3.98 sale of Tagamet and Midol that occurred at 2:14 a.m. on February 9, 1996 (the date of the murder). (Doc. 20-9 at 100-06). There were numerous items, such as cigarette butts, trash, and a comb close to David's body. (Doc. 20-11 at 62-64). Investigators also noticed suspected blood stains on a fence and planter near the victim's head. (*Id*.). Hair was collected from the planter, and samples were taken from the suspected blood stains. (*Id*.). Those materials were sent to the crime lab for analysis. (*Id*. at 78-80).

When investigators searched the house, they saw no evidence of a struggle or a cleanup effort. They looked for Tagamet and Midol (the items on the receipt) but found neither. (Doc. 20-12 at 91-92). Investigators also did not find mates to the blue canvas deck shoe, the white Nike shoe, and the brown work glove. (Doc. 20-11 at 74-75; Doc. 20-12 at 91-92). And they did not find a murder weapon. (Doc. 20-11 at 65-66). They did find an empty Coaster shoe box, size 6, in the master bedroom closet. There were no car keys on or near David's body and none in the

ignition of the vehicles parked in the driveway. (*Id.* at 83-84). Officers did find a set of car keys in the house, but they belonged to neither of the vehicles parked in the driveway. (*Id.*).

Officers located four life insurance policies ($25,000 each) on top of a filing cabinet in David's bedroom. (Doc. 20-10 at 66-69). Another $200,000 life insurance policy was later discovered. (*Id.* at 67). Petitioner was the beneficiary of the policies. (*Id.*). David's estate also received $467,000 in military survivor benefits and income of $2,008 per month. (*Id.* at 68).

### b. Det. Jones' interview of Petitioner

Det. Mike Jones was the lead investigator. (Doc. 20-12 at 28-145). When he arrived at 6:15 a.m., Petitioner was on the sofa folding clothes. (*Id.* at 30) Petitioner told Det. Jones that David was in the Canadian Air Force stationed at Tyndall Air Force Base, and that she worked for a laboratory at Tyndall. (*Id.* at 31-32). Petitioner told Det. Jones that her two sons, Daniel and Mikey, were asleep in the house. (*Id.*). Daniel was her child from a previous marriage and was 12 years old. Mikey was her child with David, and he was 3 years old. (*Id.*). Petitioner told Det. Jones that she and David had gone to bed at approximately 10:00 p.m. the night before his death (February 8th). (*Id.* at 33). They went to separate bedrooms, which was typical for them. (*Id.*).

11

Petitioner informed Det. Jones that David had an upset stomach when he went to bed. (*Id*.). Petitioner said her alarm clock went off at 5:00 a.m., and she got out of bed around 5:10 a.m. (*Id*.) At 5:45 a.m., she heard the alarm in David's room. (*Id*.). When it did not turn off, she went into the room and saw David was absent. (*Id*. at 34). She started looking for him and eventually found him lying on the ground outside. (*Id*.).

Petitioner told Det. Jones about her marriage to David. Petitioner said that David had let himself go, was no longer exercising, had gained weight, developed a drinking problem, and became impotent. (*Id*. at 34-35). Petitioner kept talking to Det. Jones about David's inability to sexually perform. (*Id*. at 35-36). This made Det. Jones uncomfortable, and he thought her comments were odd given that David had just been found dead. (*Id*.).

During the interview, Petitioner said David often went out with friends and had a severe drinking problem. (*Id*. at 40). According to Petitioner, David refused to get counseling for his drinking or their marriage problems. (*Id*.). Despite their issues, Petitioner told Det. Jones that she had been faithful to David. (*Id*. at 39).

Det. Jones asked if either Petitioner or David had recent problems with anyone. Petitioner told Det. Jones about an incident earlier in the week involving her son Daniel and some other neighborhood kids. (*Id*. at 37). One of the kids struck

Daniel with a plastic hammer, which upset Petitioner. (*Id*.). Petitioner confronted one of her neighbors, Faye Winney, about her child's involvement in the incident. Petitioner and Winney argued, and Winney pushed Petitioner off her property. Petitioner told Det. Jones that she reported the matter to the police. (*Id*.).

Det. Jones questioned Petitioner further about her discovery of David's body. Petitioner said that David's jacket was over his head, and she pulled it down. (*Id*. at 38). She kneeled beside him, checked his pulse, and his body was cold and bloody. She then called 911. Petitioner showed Det. Jones the pink house coat and slippers she had been wearing when she discovered David's body. (*Id*. at 38-39). Det. Jones expected the house coat and slippers to be covered in blood or dirt (due to the amount of blood, dirt, and leaves around David's body), but they were not. (*Id*. at 42).

While Det. Jones was speaking with Petitioner, David's boss (Canadian Air Force Col. Forgues), the family priest, and a neighbor arrived at the house. (*Id*. at 44-45). Petitioner and Col. Forgues accompanied Det. Jones to the police station for further questioning. (*Id*.). At the police station, Det. Jones conducted a "pre-interview" with Petitioner to obtain a chronology of the events preceding David's death. (*Id*. at 45). The pre-interview was audio recorded. (Doc. 20-12 at 63-82). During the pre-interview, Petitioner provided new details about that morning.

Petitioner said she awoke at approximately 3:15 a.m. and thought she heard something, but she stayed in bed and went back to sleep.  (*Id*. at 49).

During the interview, Det. Jones told Petitioner, "There's two sides to every story and now is your chance to tell me if there was a problem."  (*Id*. at 50). Petitioner then looked Det. Jones in the eye and said, "No, sir, there's three sides to every story.  There's his story; my story; and the truth; and it's your job, Det. Jones, to find the truth."  (*Id*.).  Det. Jones found that a strange thing to say under the circumstances.  (*Id*.).

Next, Det. Jones interviewed Petitioner's son Daniel with Petitioner present. Daniel told Det. Jones that he heard the phone ring twice around 11:00 p.m. or midnight, but he did not answer it.  (*Id*. at 59).  Petitioner then interjected that she also remembered the phone ringing twice at 11:00 p.m. or midnight.  (*Id*.).  She did not answer the call and assumed David did.  (*Id*. at 54).

Later that day, Det. Jones learned about the items found under David's body. At Det. Jones's request, Petitioner returned for more questioning.  She had an attorney with her, and the interview was audio recorded.  (Doc. 20-12 at 83-88). When asked about the Food World receipt for Tagamet and Midol, Petitioner denied that she or David took those medications.  (*Id*. at 87-88).  She also denied finding either medication in the house.  (*Id*.).

14

### c. The investigation continues

To generate possible leads, David's picture was broadcast on the local news with a request for information.  That led to numerous calls to the police.  As Det. Jones put it, "people were calling from everywhere, that they had seen him at this place, seen him at that place.  He was seen everywhere." (Doc. 20-12 at 91).  There were tips stating that David had been at the Gold Nugget bar, at the Thunderbirds club, at a club in Dothan, Alabama, and at a Waffle House.  (*Id*. at 93).  Investigators followed up on those tips and interviewed people who reported seeing David on the night of the murder.  (*Id*.).  During the investigation, Det. Jones received a toxicology report stating that David had no alcohol in his system when he died.  (*Id*. at 93).  That finding led Det. Jones to believe that David "could not have been in any night club drinking."  (*Id*.).  Investigators, therefore, concluded that the leads placing David in different clubs drinking were "dead" and the tipsters mistaken.  (*Id*.).

The autopsy concluded that David was killed by head trauma.  (Doc. 2-14 at 62-65).  Although no murder weapon was ever located, the medical examiner found that the wounds to David's skull were consistent with blows by a hammer.  (*Id.* at 62).  According to the medical examiner, David died ten to thirty minutes after sustaining the injuries to his head.  (*Id*. at 66).  The estimated time of death was between 4:20 to 6:20 a.m., with "two to three hours wiggle room."  (*Id.* at 68-69).

On February 12th (three days after David's death), Det. Jones interviewed Petitioner a third time. Her attorney was present, and the interview was recorded. (Doc. 20-12 at 94-135). Det. Jones told Petitioner that her son, Daniel, had reported hearing a "ruffling" noise in the hallway at 3:30 a.m. (*Id*. at 104). Daniel said he looked down the hallway and did not see any light under the door of David's room. (*Id*.). Petitioner initially responded, "My son wasn't up at that time," but then stated, "Danny may be right." (*Id.* at 104-05). Petitioner denied hearing any ruffling around 3:30 a.m., although she previously reported waking up at 3:15 a.m. because she thought she heard something.

Det. Jones told Petitioner that they had received numerous calls from the public, including reports of seeing David at a Waffle House before his death. (*Id.* at 108). Det. Jones told Petitioner the autopsy did not reveal stomach contents consistent with David having eaten at Waffle House. (*Id*.). Petitioner's attorney asked her if David may have met with someone at 2:00 or 3:00 a.m. Petitioner responded that David had done it before, and "I don't find that unusual." (*Id.* at 109). Det. Jones also told Petitioner that numerous people said they saw David at a club between 10:00 p.m. and 2:00 a.m. Petitioner's attorney asked her if David ever got up in the middle of the night and went to a bar without telling her. Petitioner responded, "At 2:00 in the morning, no. Earlier, yeah." (*Id.* at 132). At the

16

conclusion of the interview, Petitioner told Det. Jones she was leaving for Canada the following day (February 13th) to stay with her parents. (*Id*. at 134-35).

### d. Ralph Crompton is identified

Investigators next interviewed Petitioner's co-workers. From those interviews, investigators learned of Petitioner's relationship with Ralph Crompton. (Doc. 20-12 at 137-38). Upon learning that Crompton was currently working out of town in Aiken, South Carolina, investigators made a trip there.

Information obtained from an Aiken County detective revealed that Crompton had called in sick on February 8th—the day before David's murder—and nobody saw or heard from Crompton again until late in the afternoon on February 9th. (Doc. 20-10 at 49-66; Doc. 20-12 at 137-38). Crompton was staying in a Holiday Inn, and investigators interviewed the front desk clerk who was working on February 8th from 3:00 p.m. to 11:00 p.m. The clerk reported that around 5:00 p.m. on February 8th, Crompton told the front desk that he did not want to be disturbed that night or the next day (February 9th) because he had the flu. (*Id*. at 91).

The manager of the Holiday Inn stated that on February 7th, Crompton had received a message at the front desk stating that "Joel" had keys for the rental car. (*Id*. at 100). Phone records for Crompton's hotel room showed that he had called two rental car companies on January 29th. (Doc. 20-10 at 61-62). On the same day,

17

Crompton called a pay phone that was 1.3 miles from Petitioner's house in Panama City.  (*Id*.).  That call lasted over an hour.  On February 1st, Crompton called that pay phone again, and the call lasted thirteen minutes.  On February 7th at 11:17 a.m., Crompton called the conference center at Tyndall Air Force Base and talked for six minutes.  (*Id*. at 62).  On February 8th at 3:02 p.m., there was another brief call to the conference center.  (*Id*.).  On February 8th at 3:25 p.m. (approximately twelve hours before David's murder), Crompton called Petitioner's workstation at Tyndall.  (*Id*.).  That call lasted twenty-three minutes.  (*Id*. at 63).  No phone calls were made from Crompton's hotel room from late afternoon on February 8th until the afternoon of February 9th.  On February 10th at 7:03 p.m., Crompton called Petitioner's home, and the next night he called a Holiday Inn in Panama City.  (*Id*.).

An interview of Crompton's boss, John Clark, revealed that Crompton had worked ten hours on February 7th.  (*Id*. at 111-12).  He worked some on February 8th before requesting to leave due to illness.  (*Id*.).  When Clark and his wife went to the Holiday Inn to check on Crompton around 7:30 p.m., there was a "Do Not Disturb" sign on the door.  (*Id*. at 115).  On February 9th, Crompton did not show up for work.  (*Id*. at 113).  Later that evening, Crompton called to tell Clark he was feeling better and would be at work the following day, February 10th.  (*Id*. at 114).

18

One of the rental car places Crompton had called was owned by Dave Owens. After speaking with Owens, investigators learned that Crompton had rented a Mercury Topaz on February 7th. (Doc. 20-10 at 81-89). The car was returned by Crompton on February 12th, and it had been driven 989 miles. (*Id*. at 87). Law enforcement took custody of the rental car, and a forensics and serology expert processed it. (Doc. 20-11 at 8). Human blood was identified on the driver's armrest, driver's door window switch panel, and driver's door release panel. (*Id*. at 12-14).

On February 14th, investigators interviewed Crompton. A search warrant for Crompton's hotel room was then obtained, as was a warrant authorizing the collection of blood, saliva, and hair from Crompton. (Doc. 20-10 at 52; Doc. 20-11 at 20). Both warrants were executed. During the execution of the hotel room warrant, officers found papers relating to the process for obtaining a divorce in Florida. (Doc. 20-11 at 22, 24). Along with various clothing items, investigators found a daily calendar/address book. Inside of it, they found Petitioner's name and contact information. (*Id*. at 26-27). Following the execution of the search warrant, investigators placed Crompton under surveillance. (*Id*. at 29).

On February 15th, investigators saw Crompton's boss, Clark, arrive to take him to work. (*Id*. at 32-49). After knocking and not getting an answer, Clark got the hotel manager who also unsuccessfully attempted to contact Crompton. (*Id*.)

19

The manager requested police assistance in conducting a welfare check on Crompton. (*Id*. at 35). They entered the room and found Crompton in a bathtub of bloody water. (*Id*. at 36). On the toilet was a bloody knife and a day planner. (*Id*.). After calling for EMS, a detective observed a wound to Crompton's lower chest and a cut on one of Crompton's wrists. (*Id*. at 37). Crompton asked the detective if he was from Panama City, and he said "yes." (*Id*. at 37-38). Crompton then stated that Petitioner "had nothing to do with this" and was "a modern day slave." (*Id*. at 38). Crompton stated, "I did it just trying to set her free." (*Id*.) Crompton also made statements about "trying to do it right" and embarrassing his family. (*Id*.). The detective also found a note that said: "My whole life has been to protect freedom. Now mine is gone and so is my life. Marilyn and kids, I am sorry, please don't hate me. I love all of you so much that it hurts. Love, Ralph (Dad)." (*Id*. at 40). Crompton survived the suicide attempt.

Investigators subsequently received lab reports from the various swabs that were taken from the rental car, as well as from items at Petitioner's house. (Doc. 20-11 at 86-100). Those reports showed that the blood on the car window switch panel matched Crompton's DNA. (*Id*. at 93-97). The blood on the car door panel contained a mixture of DNA that matched a combination of the victim's and Crompton's DNA. (*Id*.). As for the items from Petitioner's house, the DNA matched

the victim except for two items—blood from the back of the victim's shirt matched Crompton. (*Id*.).

### e. Petitioner's interview in Canada

Det. Jones and the prosecutor, Steve Meadows, traveled to Canada to interview David's family and friends, as well as Petitioner's ex-husband. While in Canada, the two men met with law enforcement officers in Winnipeg, Canada. Those officers, Loren Schenkel and Jim Thiessen, went to the home of Petitioner's parents on February 14, 1996. (Doc. 20-13 at 10-17). Petitioner agreed to be interviewed. (*Id*. at 15). Because Petitioner did not want to be interviewed in front of her son, she agreed to accompany the officers to the police station. (*Id*.) On the way, Petitioner asked if the murder weapon had been found. (*Id*. at 16). The officers did not respond.

Once at the station, Schenkel told Petitioner that an arrest had been made. (*Id*. at 17-22). Petitioner asked how many, and Schenkel said one. Schenkel and Thiessen advised Petitioner of her rights under the Canadian Charter of Rights. (*Id*. at 21). Schenkel and Thiessen asked Petitioner how she wanted her statement to be recorded. (*Id*.) Petitioner opted for it to be recorded in writing, as opposed to by video or audio. (*Id*. at 22; 69). When presented with her recording options,

21

Petitioner said: "No, no video or audio.  I don't think it would come across very well." (*Id.* at 69).

During the interview, Schenkel took handwritten notes.  Those notes were then typed into a written statement.  Petitioner was provided with an opportunity to review and edit the written statement for accuracy.  (*Id.* at 43, 69, 85-86).  It was then signed by Petitioner.  (*Id.* at 87).  In the statement, Petitioner reported that she and Crompton were both unhappily married.  (*Id.* at 73).  She stated that David was an impotent alcoholic, and Crompton's wife was domineering.  (*Id.*)  Petitioner admitted having an affair with Crompton.  (*Id.* at 74-75).

Petitioner told the officers that Crompton came to her home a couple of times to borrow things.  (*Id.* at 75).  Crompton did not like the way David treated Petitioner and the children.  (*Id.* at 75-76).  Crompton witnessed David ridiculing her on one occasion in front of other people.  (*Id.* at 76).  On another occasion, Crompton witnessed David walking on the driveway with their young son on his shoulders, and their son fell.  (*Id.* at 76).  Petitioner had told Crompton about her dispute with a neighbor, during which the neighbor pushed her into a garage door.  Petitioner expressed to Crompton that David was unsupportive regarding the incident.  (*Id.* at 76-77).  According to Petitioner, this incident "broke the camel's back" with Crompton.  (*Id.* at 77).  It led Crompton to tell her that, "he was just going to come

22

in at night and have a word with David, show him what it felt like to get pushed around." (*Id.* at 77, 86).

Petitioner told the officers that she talked to Crompton on Thursday morning (February 8th).  (*Id.* at 77-78).  Crompton said he was coming down for the weekend and would see David at 9:00 p.m. or 10:00 p.m. that night.  (*Id.* at 78).  Crompton then called Petitioner between 11:00 p.m. and midnight, and she answered the phone in her bedroom.  (*Id.* at 78-79).  Petitioner told the officers that David was awake and walking around the house.  (*Id.* at 79-80).  During the phone conversation, Crompton told Petitioner to get out of the house so he could confront David.  (*Id.* at 79).  She refused to do so because her kids were inside.  (*Id.*).  Crompton then told Petitioner to get David out of the house.  (*Id.*).

Petitioner told the officers that Crompton said he would be waiting for David, and David would not know it was Crompton.  (*Id.*).  Petitioner told the officers she interpreted this to mean that Crompton intended to disguise himself or confront David in a dark place.  (*Id.*).  When the officers asked Petitioner whether she planned with Crompton what he was going to do to David, Petitioner responded, "No, we never talked about it.  That would make me an accessory."  (*Id.* at 68).

Petitioner further explained that she and Crompton agreed that she would get David to leave the house.  (*Id.* at 79).  She did this by suggesting that David go to

23

the store to get something for his upset stomach.  Petitioner stated that Food World and Albertson's were both open 24 hours and nearby.  (*Id.* at 80).  Petitioner told the officers that David left the house approximately 30 to 45 minutes after her phone call with Crompton. (*Id.*).  Petitioner told the officers she knew that Crompton was waiting outside for David, but she did not know whether Crompton would confront David before or after David went to the store.  (*Id.* at 80-81).

Petitioner told the officers that she heard David start up their van, and she then went into the bedroom with her son Daniel where she stayed the remainder of the night.  (Doc. 20-13 at 81).  Petitioner said she did not hear or see anything, and then Crompton called her a few hours later.  (*Id.*).  Petitioner told the officers that Crompton said, "it got out of hand and that it was ugly and that me and the kids would be all right, and then something like David was dead." (*Id.* at 81, 86). Petitioner told the officers, "Jesus Christ, the man wasn't supposed to do that, he wasn't supposed to kill him." (*Id.* at 81).

After the call from Crompton, Petitioner said she went outside and found David in the bushes with his coat over his head. (*Id*. at 82).  She felt stuff on her hands when she touched David's head, which led her to believe he was dead. (*Id*. at 83).  Petitioner then called 911, checked on the kids, and went back outside to wait for the police. (*Id.*).

24

Petitioner said she did not tell the Florida investigators about her relationship with Crompton or of Crompton's involvement in David's death. (*Id*.) Petitioner denied killing David or wanting him killed. (*Id.* at 66, 87). Petitioner told the officers that Crompton called her three days after David's murder. (*Id*. at 83). They talked briefly, and Crompton said he was in shock. (*Id*.). Petitioner told Crompton that she could not eat or sleep and had talked to the police but did not know what to say. (*Id*. at 83-84). Crompton told Petitioner that she was going to be the prime suspect, and then he hung up. (*Id*.). Petitioner told the officers she called Crompton the next day, but he would not talk to her. (*Id.* at 84). Petitioner admitted that she would receive approximately $500,000 because of David's death. (Doc. 20-13 at 67, 85).

At the conclusion of the interview, Petitioner inspected Schenkel's handwritten notes and signed them to acknowledge their accuracy. (*Id*. at 85-92). When asked why she agreed to give the statement, Petitioner stated, "Because I feel responsible and I just can't live with this. I want you to know what really happened here because it needs to be told. I did not kill my, I did not kill him because I didn't, I didn't kill him and I didn't want him killed." (*Id*. at 87).

### f.  Information obtained from coworkers and friends

A day or two after David's murder, one of Petitioner's coworkers, Gary Wagner, visited her.  (Doc. 20-9, 73-87).  Petitioner was out shoe shopping when Wagner arrived.  (*Id*. at 82).  When Petitioner returned from shopping, Wagner said she did not appear to be upset, showed no expression of grief, and was happy she had received a good deal on some shoes.  (*Id*. at 82-83).

Another coworker of Petitioner's, Sam Cox reported that one of the 32-ounce ball peen hammers was missing from the shop.  (Doc. 20-14 at 43).  He further stated that the building was open and accessible to many people.  (*Id*.).  According to Cox, the hammer had disappeared when Crompton was in South Carolina.  (*Id*. at 43-44).

Another coworker reported that on February 8th, he overheard Petitioner having a loud and emotional phone conversation.  (Doc. 20-9 at 64-73).  During the conversation, Petitioner said, "we (or I) can't be having kids coming up with bloody faces beaten up all the time."  Petitioner left the office shortly after the call ended.  (*Id*. at 67-68).

Jeff Teplichek, a former co-worker of Petitioner's recalled meeting David at social events.  (Doc. 20-13 at 99-108).  According to Teplichek, he never saw David drinking excessively.  (*Id*.).  He also reported that Crompton and Petitioner had a close relationship and were often together at work.  (*Id*.).  Marsha Cassell, another

former co-worker of Petitioner's, recalled hearing Petitioner say that she might divorce David if she got a "green card." (Doc. 20-13 at 108-15). Coworker Anna Felix also recalled Petitioner complaining about her marital issues with David, as well as his heavy drinking. (*Id*. at 115-23). Felix was aware of Petitioner's romantic relationship with Crompton, reporting that she knew Crompton and Petitioner had met up at a hotel. (*Id*. at 119). According to Felix, she was with Petitioner the Monday after David's murder. She thought Petitioner was acting strange for somebody whose husband was just murdered. (*Id*. at 121).

Another coworker, Marlene Cantrell, also stated that Petitioner had complained about marital problems with David. (Doc. 20-13 at 130-39). Petitioner told Cantrell that David drank heavily and had some health problems. (*Id*.). According to Cantrell, two months before David's death Petitioner reported that David had quit drinking. (*Id*. at 134). Petitioner and her children stayed at Cantrell's house on Friday and Saturday after David's death. (*Id*. at 135-36). And on Sunday night, Cantrell stayed with Petitioner and her children in a Holiday Inn. (*Id*.). Then on Monday, Petitioner and her children stayed at Cantrell's house again. (*Id*.). That night—February 12th—Crompton called Petitioner while she was at Cantrell's house. (*Id*.). Petitioner told Cantrell that Crompton cried during their conversation, but Petitioner said she did not cry. (*Id*. at 136).

27

At the conclusion of the investigation, Crompton and Petitioner were charged with first-degree murder.    Crompton was convicted and sentenced to life imprisonment, while Petitioner was fighting extradition in Canada.    Following her eventual extradition, Petitioner went to trial on the first-degree murder charge.

### g.  Petitioner's defense at trial

At Petitioner's trial, she presented the testimony of Donald Hinson, Helen Cormier, her son Daniel, Bruce Pennington, Elaine Thomas, Officer Mike Metielle, and Det. Dan Bates.    Daniel testified that his stepfather, David, was often drunk. (Doc. 20-15 at 40).    According to Daniel at around 2:30 a.m. on the day David was murdered, Daniel saw a man with a blond ponytail and a knife inside the house.    (*Id*. at 44, 48).    The man demanded a briefcase and took Daniel into Petitioner's room. (*Id*. at 48).    The man then located a briefcase in the closet and told Daniel he would not harm him, Petitioner, or his brother if Daniel stayed quiet.    (*Id*.).    Daniel then went back to bed.    (*Id*. at 49).    Daniel testified that he never told the police about this mystery intruder and had only ever before told it to a Canadian reporter.    (*Id*.). Daniel testified that his mother had also seen the pony-tailed intruder in the house. (*Id*. at 48).    According to Daniel, he never told this story to the police because the man had threatened to harm his brother.    (*Id*. at 51).

28

Donald Hinson was one of the EMTs who responded to Crompton's attempted suicide in South Carolina. (Doc. 20-14 at 75-79). Hinson testified that Crompton was conscious, alert, and oriented. (*Id*.). Crompton told Hinson that he tried to kill himself by cutting his wrist. Hinson asked Crompton why, and Crompton responded, "I am one of the bad guys; they want me for murder." (*Id*. at 78).

Cormier testified that she had been friends with Petitioner in Canada. (Doc. 20-15 at 22). She described David as a heavy drinker. (*Id*. at 26). Cormier had provided Petitioner with advice on getting a divorce. (*Id*. at 28). Pennington was Petitioner's previous boss. (*Id*. at 52). He described Petitioner as an excellent and ambitious employee who wanted to stay in the United States after David's discharge from the Canadian military. (*Id*. at 52-53). Officer Metielle testified that phone records of calls from Petitioner's residence had been subpoenaed but then lost. (*Id*. at 59-62). Det. Bates testified that he did not recall keys in Petitioner's residence to the van or Volkswagen car they owned, but there was another set of keys in the house. (*Id*. at 68-69). He also confirmed that no bodily fluids had been found from the Nike shoe that was near David's body. (*Id*. at 70-71).

Elaine Thomas testified that she worked at an automotive shop in Panama City. (Doc. 20-15 at 55-58). She explained that on September 1, 1995, David had paid to repair a Toyota Camry—a vehicle neither he nor Petitioner owned.[3] (*Id.*).

Petitioner's trial counsel subpoenaed Crompton—who had already been convicted of David's murder—to testify at her trial. (Doc. 20-15 at 8). Outside the presence of the jury, Crompton refused to testify. The trial court, therefore, declared Crompton unavailable. (*Id.* at 84). Considering the determination of unavailability, defense counsel sought to admit certain portions of Crompton's prior testimony from his own trial.[4] (*Id.* at 8-13, 75-76). The prosecution argued that the rule of completeness required admission of the entirety of Crompton's prior testimony. (*Id.* at 76). After the trial court ruled in the prosecution's favor, Petitioner's attorney decided not to admit certain aspects of Crompton's prior testimony. (*Id.* at 89-90).

In addition to calling her own witnesses, Petitioner's counsel cross-examined the prosecution's witnesses. During defense counsel's cross-examination of Det. Jones, Jones stated that police had received calls from people who said David had

---

[3] According to Petitioner's trial counsel's testimony at the state post-conviction evidentiary hearing, the purpose of this evidence was to suggest that David was spending money on other women. (Doc. 21-13 at 29-30).

[4] At defense counsel's request, the entire transcript of Crompton's trial was made part of the trial record in Petitioner's case, but it was not admitted as evidence. (Doc. 20-15 at 90-91).

been in the Gold Nugget and the Toy Box (both strip clubs) shortly before he was found dead.  Det. Jones, however, was unable to conclusively place David in either of those locations the night he was killed.  (Doc. 20-12 at 141-42).  Detective Jones elaborated on re-direct examination:

> Q [by one of the prosecutors].  Some of these same people that claim that Major Turenne was in these clubs, like the Golden [sic] Nugget and the Toy Box, some of those same people claimed he was there the night he was murdered, didn't they?
>
> A.  Yes, sir.
>
> Q.  Drinking several beers?
>
> A.  Yes, sir.
>
> Q.  And you had your blood alcohol level that came back from the autopsy, didn't you, sir?
>
> A.  Actually came back that night, that Friday night.
>
> Q.  And as a result you knew that was not true?
>
> A.  Yes, sir.
>
> Q.  He was not in those places?
>
> A.  Exactly.
>
> Q.  They were mistaken?
>
> A.  Yes, sir.

(Doc. 20-12 at 145).  Det. Jones testified on re-redirect that the Food World was 1.4 miles from the Turenne home.  (Doc. 20-13 at 8-9).

### 3.    Petitioner's "new evidence" of actual innocence[5]

The evidence that Petitioner identifies in her § 2254 petition as "new evidence" of her actual innocence consists of witness statements by people who claim to have seen David at the Gold Nugget on the date of his murder, as well as an email from a forensic toxicologist obtained by Petitioner's sister.  Petitioner attempts to use this "new evidence" to support her current theory regarding David's murder.

Under that current theory, Petitioner did not (as she previously admitted in her statement to the police) send David out late at night to get some medicine knowing

---

[5] Petitioner submitted numerous exhibits with her "supplemental" habeas petition and her response to Respondent's motion to dismiss.  (Doc. 3-1; Doc. 24-1).  Some of those exhibits relate to the trial court's pre-trial rulings on legal issues, which Petitioner challenges in Grounds One and Four of her § 2254 petition (the legal sufficiency of the indictment and the admissibility of Petitioner's statements to police).  (Doc. 1 at 6, 11; Doc. 3-1 at 4-13, 56-64; Doc. 24-1 at 2-6, 9, 58-72).  The Court will not address these exhibits in its discussion of Petitioner's actual innocence argument.  Although they may lend support to an argument of *legal* innocence, they are not probative of her *factual* innocence.  *See Woulard v. Sec'y, Dep't of Corr.*, 707 F. App'x 631, 635 (11th Cir. 2017) (rejecting petitioner's actual innocence claim based on "new evidence" that would have supported a motion to suppress); *San Martin v. McNeil*, 633 F.3d 1257, 1268 (11th Cir. 2011) (holding that the actual innocence exception requires the petitioner to demonstrate "that [s]he is factually innocent rather than legally innocent.").

that Crompton was waiting for him. Instead, David was not even at home the night he was murdered. Rather, he was out partying with some members of a rough crowd. One of the members of that rough crowd was a guy named "Diablo." According to Petitioner's latest version of events, "Diablo" was associated with Crompton and helped Crompton kill David. Petitioner claims it was "Diablo" who Daniel supposedly saw enter the house late at night searching for a briefcase. The email from the toxicologist supports Petitioner's new theory, she says, because it shows David could have been out drinking yet still have had no alcohol in his system when he died.

For the reasons below, Petitioner's "new evidence" fails to satisfy the high standard for the actual innocence gateway announced in *Schlup*. The Court is not persuaded that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 547 U.S. at 537 (internal quotations omitted). Thus, this case is not one of the "extraordinary" and "rare" cases where a petitioner should be allowed to gain review of an untimely habeas petition through the actual innocence gateway. To understand why, let's look at Petitioner's "new evidence."

33

### a.    Email from forensic toxicologist

Petitioner claims she has submitted "new evidence" in the form of an opinion from a forensic toxicologist regarding the rate at which the human body metabolizes alcohol.  Far from a detailed and thorough expert opinion, what Petitioner has offered is a 2011 email exchange between Petitioner's sister and Dr. Bruce A. Goldberger of the University of Florida.  (Doc. 3-1 at 65).  In the email, Petitioner's sister posed the following hypothetical to Dr. Goldberger:

> In a time span of 7 hours, how many beers (budweiser) it would take to metabolize out of your system and bring on a alcohol blood level of 0 and/or if he drank 1 beer, how long would it take to metabolize out of your system?

(*Id.*).  In a two-sentence response, Dr. Goldberger said that the "typical" metabolic rate of alcohol is 0.015-0.018 g/dL of alcohol per hour, but "this rate can vary considerably."  (*Id.*).  Dr. Goldberger commented that at the "typical" rate, a 70 Kg (154-pound) male eliminates "about 2/3 of a beer per hour."  (*Id.*).  There is nothing else submitted by Petitioner regarding Dr. Goldberger—no affidavit, no expert report, no deposition testimony.  All the Court has been given is a two-sentence email response to a narrow, assumption-laden, hypothetical posed by Petitioner's sister.  Petitioner has also submitted a printout from the website of the National Institute of Health titled, "Interpreting results of ethanol analysis in postmortem specimens:  a review of the literature." (Doc. 24-1 at 77).  And Petitioner submitted

34

an unsourced document describing the rate of alcohol absorption in the body. (*Id.* at 78).

According to Petitioner, the email from Dr. Goldberger and the website printout support her new theory that David was drinking and partying at the Gold Nugget on the night of his death even though there was no alcohol in his system. (Doc. 24 at 33-36). She contends that this information undercuts the prosecution's argument that David could not have been out drinking because he had a blood alcohol content of zero at the time of his death.

> ### b. Witness statements regarding David's presence at the Gold Nugget

Petitioner's next category of "new evidence" consists of witness statements from several people who claim David was at the Gold Nugget before his murder. Some of the witness statements were provided to Det. Jones during the 1996 investigation. Others are statements provided many years later to Petitioner's private investigator.

As for the witness statements that were provided to Det. Jones, the Court is skeptical that those "statements" actually qualify as "new" evidence. They were obtained in 1996 and were available to defense counsel at the time of trial. In any event, the Court will treat them as "new evidence" because the issue of exactly what constitutes "new evidence" is undecided in the Eleventh Circuit. *See Green v. Sec'y,*

*Dep't of Corr.*, 28 F.4th 1089, 1151 n.132 (11th Cir. 2022) (recognizing, but refusing to take a side in, a circuit split regarding the definition of "new evidence," with some circuits requiring that the evidence be newly discovered and others requiring that the evidence merely be newly presented).

Shortly after David's murder, Det. Jones spoke with employees of the Gold Nugget because there were tips stating David had been seen there before his death. Steven McGinn, the Gold Nugget's manager, reported seeing David at the establishment in the late hours of February 8th and early hours of February 9th. (Doc. 3-1 at 43-46). According to McGinn, David was there from approximately 10:00 p.m. until approximately 2:00-2:30 a.m. McGinn recalled David buying beer approximately twelve times that night. Although McGinn did not see David with anybody else, he believed he was probably with somebody because he bought two beers at a time during several trips to the bar that night. McGinn told Det. Jones that he had not seen David at the Gold Nugget before that night.

Cynthia Goldman, a dancer at the Gold Nugget, provided a statement to Det. Jones on February 9, 1996. (Doc. 3-1 at 37-40). Goldman stated she saw David in the bar at approximately 10:00 p.m. on February 8th, and he stayed for approximately two hours. Goldman stated that she did not see anyone with David,

and that she did not see him drinking.  Goldman stated she had seen David three times before, and he was with two other men on one of those occasions.

Kathy Lockard, another dancer, spoke with Det. Jones on February 10, 1996. (Doc. 3-1 at 40-42).  Lockard reported seeing David between 8:00 p.m. and midnight, which was when she left the Gold Nugget.  According to Lockard, David was alone at the time.  Larita Miller, also a dancer, provided a statement to Det. Jones on February 10, 1996.  (Doc. 3-1 at 48-55).  Miller was working at the Gold Nugget on the evening of February 8, 1996, and into the early morning hours of February 9, 1996.  (*Id*. at 49).  Miller denied seeing David in the club that night.  (*Id*. at 54-55).

A private investigator hired by Petitioner spoke to some of those individuals years later and obtained statements from them.  More specifically, the private investigator obtained statements from Goldman and Miller.  The statement from Goldman came approximately fourteen years after the murder (October 10, 2010) while Miller's statement was approximately fifteen years later (June 17, 2011). (Doc. 3-1 at 35, 47).

In Goldman's 2010 statement, she said David was a "regular customer . . . for several months" at the Gold Nugget prior to his murder.  (*Id*. at 35).  She said David always had a black bag with him.  (*Id*.).  Beginning in late 1995, David was joined

37

by two others: "Diablo," and "Mikey." (*Id.* at 35). According to Goldman's 2010 statement, the three men "came in together on a regular weekly basis for months." (*Id.*). "Diablo" and "Mikey" dealt marijuana and cocaine from David's black bag. (*Id.*). The last night David came to the Gold Nugget, he was alone, did not have his black bag, and was not drinking. (*Id*). According to Goldman, a man named "Ralph" sometimes came in with David and "Diablo." She identified a photo of Crompton— Petitioner's lover—as the Ralph who sometimes came in with David.   (*Id.* at 34- 35). Goldman did not explain why she failed to disclose this information to the police in 1996. She also failed to explain why she had not come forward with it in the intervening fourteen years. Goldman also did not address the inconsistencies between her 1996 statement and her 2010 statement.

Turning to Miller's 2011 statement to the private investigator, she recalled seeing and briefly speaking with David at the Gold Nugget on the night of his murder. According to Miller, David was alone at the club. Later in the night, Miller asked David to go buy her something for her heartburn and cramps. David then left to get her the medicine, and she never saw him again. According to the 2011 statement, Miller lied to Det. Jones when she told him in 1996 that she had not seen David. As the reason for her lie, Miller stated she was afraid she would get fired if she told the police what had happened.

38

Aside from Goldman and Miller, the private investigator obtained statements from two other people who recalled seeing David at the Gold Nugget nearly fifteen years earlier. One of those people was April Suchan who was in prison on May 7, 2012, when she provided a statement to the private investigator. (Doc. 24-1 at 20-39). According to Suchan, she had been friends with Mike Moore who was David's "partner." In her statement, Suchan said that David regularly came into the Gold Nugget with Mike, Crompton, and a guy named "Diablo."

She said that on February 8, 1996, she and Mike picked up David at approximately 10:30 p.m. and went to the Gold Nugget. Suchan described David as not much of a drinker, and she said he was not drinking on February 8th. She said David sometimes carried a bag to the Gold Nugget, but he did not have it with him on February 8th. According to Suchan, between 12:00 and 12:30 a.m. on February 9th, "Diablo," Crompton, and another guy named "Chief" had an altercation with David. Then, between 3:00 and 3:30 a.m., David borrowed Mike's car to go buy something for one of the dancers. After going to the store, Suchan said David met her and Mike at the Waffle House where they stayed until around 4:15 or 4:30 a.m. Mike then took David home.

Suchan reported seeing a television show about David's murder. (Doc. 24-1 at 41). She saw Petitioner on the TV show, as well as in prison. But, she denied that

they ever spoke.    (Doc. 24-1 at 41-42).  Suchan wrote a letter to Petitioner's prior post-conviction attorney at the urging of "Sue Ellen," which prompted the interview with the private investigator and Petitioner's attorney.  (*Id.* at 42-43).  When asked why she had not come forward sooner, Suchan answered that Mike told her "they pretty much had everything that they needed . . . they wouldn't need us."  (*Id.* at 43).

The other person who gave a statement to the private investigator was Amy Jean Brady.  (Doc. 24-1 at 49-55).  She gave that statement on September 24, 2012—approximately sixteen years after David was murdered.  Brady stated she, her husband, and two friends went to the Gold Nugget at approximately 11:30 p.m. on February 8, 1996.  (*Id.* at 49).  Brady stated she saw David there, and David bought them all drinks even though he was not drinking.  (*Id.* 49-50).  According to Brady, three men entered the Gold Nugget at 1:30 a.m. and approached David.  (*Id.* at 51).  One of the men pushed David into a wall a few times and yelled something about "his stuff & money."  (*Id.* at 51, 55).  The confrontation lasted a couple of minutes.  (*Id.* at 51).  Brady noticed that "the tall blond haired one known around as "Diablo" was still upset" and kept cursing and pacing near David.  (*Id.* at 52).  The second man was tall with dark hair, and the third man was short and stocky with balding grey hair.  (*Id.* at 52-53).  She said "Diablo" was a drug user and dealer.  (*Id.* at 52).  According to Brady, David and his friends "dealt with ["Diablo"] from time to time

40

for marijuana and cocaine." (*Id.*).  Brady heard rumors that David and his friends sold drugs at Tyndall Air Force Base and in local bars.  (*Id.*).  Brady stated that one of the men who confronted David at the Gold Nugget was Crompton.  (*Id.* at 52-54).

Brady's statement says that the three men left the Gold Nugget while David stayed behind.  (*Id.* at 53).  Brady did not notice David again until she left the lounge at 2:30-2:40 a.m. and saw David re-entering.  (*Id.* at 53).  Brady heard about David's murder when it happened, but her husband said they did not need to come forward because other people would do so.  (*Id.* at 54).  Brady's husband died in November 2001 (five years after David's murder).  (*Id.*).  Brady stated she was not emotionally or mentally able to "come forth" after her husband's death.  (*Id.*).  She did not explain why she suddenly came forward in September of 2012.

The private investigator also collected a statement form Neal Hagen.  (Doc. 3-1 at 26; Doc. 24-1 at 14).  Hagen stated he worked with Terry Johnson a/k/a "Diablo" as a tattoo artist from 1991-1996.  (Doc. 24-1 at 14).  Much of Hagen's statement consists of hearsay statements from "Diablo" and others, as well as other information about which Hagen has no personal knowledge.  The remainder of Hagen's statement includes a physical description of "Diablo" and the vehicle he drove (a red 1986 Camaro).  (*Id.*).  Hagen stated "Diablo" was a drug dealer who operated at various strip clubs.  (*Id.*).

**4.    Petitioner's "new evidence" does not satisfy the actual innocence gateway standard**

Having described Petitioner's "new evidence," the Court will now explain why it is insufficient to satisfy the high *Schlup* standard.  First up is the email from Dr. Goldberger to Petitioner's sister.  The email is not an affidavit or otherwise sworn.  That alone makes it of questionable reliability.  *See Milton*, 347 F. App'x at 531 (stating that a statement that was neither sworn nor signed was unreliable).  Additionally, it is two sentences long and provides no analysis or discussion of the facts of this case.  It is by no means an expert report or an expert opinion that could reasonably be relied on by the Court in making a determination.  It is a casual email sent to Petitioner's sister in response to a hypothetical loaded with assumptions.

Moreover, the information in Dr. Goldberger's email does not tend to show that Petitioner is factually innocent of second-degree murder.  The email—like all of Petitioner's "new evidence"—must be considered in connection with the evidence introduced at trial.   At Petitioner's trial, the prosecution introduced damning evidence in the form of *her* statement to the Canadian police where she *admitted* that (1) David was at home, and (2) she sent him out of the house when she knew Crompton was lying in wait to attack him.  Nothing Dr. Goldberger says in his email undermines or otherwise undercuts Petitioner's own statement about what happened before David's death.

42

As for the various witness statements, they too are insufficient to cast doubt on Petitioner's guilt. Their reliability is questionable, to say the least. We start with the Eleventh Circuit's admonition that "affidavits alone are not a promising way to demonstrate actual innocence." *Mize v. Hall*, 532 F.3d 1184, 1197 (11th Cir. 2008). "Though sworn, they are not convincing evidence of innocence because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." *Id.* (cleaned up); *see also Cotton v. Schriro*, 360 F. App'x 779, 780 (9th Cir. 2009) ("Because post-trial affidavits are obtained without the benefit of cross-examination, they are to be treated with a fair degree of skepticism.") (cleaned up). And affidavits submitted years after an event are even less reliable. *See Milton*, 347 F. App'x at 531 (noting that the reliability of the affidavits supporting the petitioner's actual innocence claim was questionable because the affidavits were presented more than ten years after the murder and roughly eight years after the petitioner's trial); *see also Arthur v. Allen*, 452 F.3d 1234, 1246 (11th Cir. 2006) (explaining that "affidavits produced at the 11th hour with no reasonable explanation for the nearly decade-long delay are suspect") (cleaned up). The Supreme Court has similarly recognized that the "timing of the petition is a factor bearing on the reliability of the evidence purporting to show actual innocence." *McQuiggin*, 569 U.S. at 386 (cleaned up).

The statements provided to the private investigator are dated 2010, 2011, and 2012. David was murdered in 1996. Petitioner was convicted in 2005. Thus, there is a significant time gap between the events at issue and the date the statements were provided to the private investigator. These individuals waited over a decade after the murder and five years after Petitioner's conviction to come forward. None of the affiants have provided reasonable explanations for waiting so long to provide the information. At most, the affiants have said that they were reluctant to get involved or did not think their information was necessary. Such explanations are insufficient. *Milton*, 347 F. App'x at 531 (finding that affiants' statements that they waited to come forward because "they did not wish to 'get involved'" was not a "reasonable explanation" for the delay).

Setting aside the reliability problems inherent in statements submitted years later without a satisfactory explanation, the statements provided by Petitioner are inconsistent with each other, inconsistent with prior statements made to the police, and inconsistent with Petitioner's own words.

For example, several days after David was murdered in 1996 Larita Miller provided a recorded statement to Det. Jones. In that statement, Miller denied seeing David at the Gold Nugget on the night of his death. Then in 2011—approximately **fifteen years** after David's murder—Miller provided a sworn statement to

44

Petitioner's private investigator stating that David was actually at the Gold Nugget on the night of his murder. Not only was he at the Gold Nugget that night, but despite the passage of so much time, Miller specifically recalled that David left the Gold Nugget that night to buy her medicine for her heartburn and cramps. She has not provided a satisfactory answer for waiting so long to come forward with this information.

Additionally, in the 2011 statement Miller said that David was alone at the Gold Nugget on the night of his murder. Cynthia Goldman's 2010 statement says the same thing. On the other hand, the 2012 statement of April Suchan says the opposite. According to Suchan, David was at the Gold Nugget the night of his murder with her and other individuals.

The statements submitted by Petitioner are also inconsistent regarding how frequently David visited the Gold Nugget. Suchan's 2012 statement portrays David as one of the regulars at the club. Cynthia Goldman's 2010 statement says the same thing. In her 1996 statement to the police, however, Goldman stated that she had only seen David in the Gold Nugget three times. And the manager of the Gold Nugget, Steven McGinn, stated in 1996 that he had seen David in the club for the first time on the date of his murder.

Simply put, the statements submitted by Petitioner are unreliable.  They are inconsistent with each other.  They are inconsistent with prior statements the affiants made to the police when the incident would have been fresh in their minds.  And, perhaps most importantly, they are irreconcilable with the inculpatory statement Petitioner provided to the Canadian police.  A statement that was made in writing. A statement that Petitioner reviewed, edited, and signed.  And a statement that clearly implicated Petitioner in David's death at the hands of her lover, Ralph Crompton.[6]  *See Claritt v. Kemp*, 336 F. App'x 869, 870 (11th Cir. 2009) (finding unpersuasive an affidavit submitted in support of habeas petitioner's actual innocence claim because it was inconsistent with the petitioner's statements to police).  This Court, therefore, agrees with the state trial court judge who found as follows when rejecting Petitioner's state post-conviction motion: "The jury convicted [Petitioner] because she confessed to sending her husband out of the house to be confronted and assaulted by Crompton.  It was the one piece of evidence they couldn't get over.  It is highly improbable that the jury would have found these new statements to be more credible than her own confession."  (Doc. 23-2 at 83).  The

---

[6] Although Petitioner previously admitted to having an affair with Crompton (and other witnesses testified regarding the affair), Petitioner now claims there was never an affair. (*See* Doc. 24 at 6).  According to her, she was too busy with her household duties to "have a desire" or "time or energy" for an affair.  (*Id*.).

state trial court judge also referred to the theory currently advanced by Petitioner as her "fourth version of events leading up to her husband's murder." (*Id*. at 78).

Aside from being unreliable, the evidence provided by Petitioner is insufficient to show that "no reasonable juror would have convicted" her had the "new evidence" been presented at trial. *Schlup*, 513 U.S. at 327. According to Petitioner, this "new evidence" shows that David lived a double life that involved sneaking out at nights to attend strip clubs where he dealt drugs. One of the people David was involved with in his supposed drug business happened to be Crompton (Petitioner's lover), along with a shadowy figure known as "Diablo." As the story goes, on the night of his death David snuck out of the house, was picked up by a friend, and went to the Gold Nugget to party. While at the Gold Nugget, David was confronted by "Diablo" and Crompton (and possibly another guy named "Chief") over something related to drugs. At around 2:00 a.m., David left the Gold Nugget to buy Midol and Tagamet at Food World for a stripper who had cramps and heartburn. "Diablo" and Crompton then went to David's house where "Diablo" entered the home to recover a black bag (which apparently contained drugs and/or money). Crompton and/or "Diablo" then confronted David in the front yard and bludgeoned him to death. And Petitioner had nothing to do with any of it. In fact, as far as she knew at the time David was asleep in his bedroom the entire night.

47

Some of the "new evidence" may have corroborated the intruder story Petitioner's son Daniel told at trial (but had failed to previously tell the police). But none of the "new evidence" can be squared with Petitioner's inculpatory statement to the Canadian police. Petitioner confessed to an affair with Crompton. She confessed that Crompton was planning to confront David. She confessed to getting David out of the house so that the confrontation could occur. The evidence at trial clearly showed that, as planned, Crompton confronted David in the yard of his house. And that confrontation led to David's death. None of what Petitioner told the police can be reconciled with what she now—in her latest version of events—says happened to David. Petitioner's current denial of her affair with Crompton also cannot be squared with the evidence from multiple sources regarding their adulterous relationship—including admissions by Petitioner and Crompton. It shows that Petitioner is simply throwing spaghetti at the wall and hoping something sticks.

At the end of the day, Petitioner has not offered sufficient "new evidence" to show that her case is one of the "rare" and "extraordinary" cases where "it is more likely than not that no reasonable juror would have convicted [her] in the light of the new evidence." *Schlup*, 513 U.S. at 327. Having considered the entirety of the record and the "new evidence," the Court does not believe a reasonable juror would

have decided this case any differently had the "new evidence" been presented at trial. Instead, a reasonable juror likely would have concluded that what happened to David Turenne was what Petitioner admitted happened to him—that her lover, Ralph Crompton, bludgeoned David to death after Petitioner sent him out of the house knowing Crompton was lying in wait.  Petitioner, therefore, is not entitled to raise her untimely habeas corpus claims through the actual innocence gateway.

### III.    Conclusion

 For the reasons above, Petitioner's 28 U.S.C. § 2254 petition for habeas corpus should be dismissed as untimely.

### IV.    Certificate of appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

Section "2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his [or her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. 100, 115 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That Respondent's motion to dismiss (Doc. 17) be **GRANTED**.

2.    That the petition for writ of habeas corpus (Doc. 1) be **DISMISSED with prejudice** as untimely.

3.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 7th day of February.

/s/ *Zachary C. Bolitho*
Zachary C. Bolitho
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**